UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| DELEA RODEHAN-HENDRESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 4:14cv17 |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) as provided for in the Social Security Act. 42 U.S.C. §416(I). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since September 17, 2010, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia, a remote history of a right shoulder disorder, and bipolar disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, and that she has no limitations in her ability to stand and/or walk, and sit throughout an 8 hour workday. However, the claimant is unable to maintain any position for more than 60 minutes at one time and she must be allowed to change or alternate positions for 5 minutes after, or during, each 60 minute interval of sitting, standing and/or walking, provided that she does not abandon her work station or lose concentration on her work tasks. In addition, the claimant can occasionally climb ramps and stairs, and she can occasionally balance, stoop, kneel, crouch, and crawl, but she can never climb ladders, ropes or scaffolds. The claimant has no restrictions in the upper left extremity, but she can never reach overhead with the dominant right upper extremity. Furthermore, the claimant should avoid workplace hazards such as driving or operating machinery at work, hazardous environments such as unprotected heights, exposed flames, and large bodies of water, and she should avoid concentrated exposure to unguarded hazardous machinery such as a punch press or unguarded moving blades, etc. The claimant is further limited to work which involves no more than simple, routine and repetitive tasks, occasional and minor changes in the workplace setting in terms of work place, work processes, and work product, simple decisionmaking involving a choice among a limited number of anticipated options and not requiring creative solutions to novel situations, simple judgment, work which deals with the concrete rather than the abstract, and work which deals with things rather than people. The claimant is further limited to work which does not involve direct public service, but she can tolerate brief and superficial interaction with coworkers and supervisors as is common in unskilled work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 5, 1962 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 17, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-28)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on September 16, 2014. On December 18, 2014, the defendant filed a memorandum in support of the Commissioner's decision, and on January 28, 2015 2014, Plaintiff filed her reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her

> former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).  From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff protectively filed an application for Disability Insurance Benefits ("DIB") on October 20, 2010, alleging a disability onset date of February 13, 2009.  (Tr. 14) On July 26, 2012 Plaintiff, her mother, and a vocational expert testified at an administrative hearing before Administrative Law Judge (ALJ) Edward P. Studzinski (Tr. 35-99).  Plaintiff, through her attorney, amended her alleged disability onset date from February 13, 2009 to September 17, 2010 (Tr. 14, 165).  On October 26, 2012, the ALJ determined that Plaintiff was not disabled.  On December 12, 2013, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. The Appeals Council explained that the additional evidence Plaintiff's counsel had submitted after the ALJ's decision did not provide a basis for changing the ALJ's decision (Tr. 2).

Plaintiff was born on July 5, 1962. (Tr. 240) Plaintiff was 50 years old at the time of the hearing in July 2012. Plaintiff is a high school graduate. (Tr. 141) Plaintiff worked as a secretary from 1980 to February 2009 for Emerson Power Transmission Solutions in Monticello, Indiana. (Tr. 171, 808-866)

Plaintiff has a history of mental illness and chronic pain. In January 25, 2008, Plaintiff was

5

seen by her primary care physician Rene Gutierrez with a three day acute migraine headache, nausea and photophobia. She was given injections of Nubain and Toradol. ( Tr. 722). In March 4, 2008 Plaintiff again saw her doctor complaining of body aches for six months, having a dull ache in the hips, neck, knees and shoulder and feeling stiff. Dr. Gutierrez observed pronounced trigger points on the neck and upper shoulder area. (Tr. 721) Later that week, Plaintiff underwent imaging scans at White County Memorial Hospital. (Tr. 559) She developed more acute low back pain lying on the imaging table. Dr Gutierrez diagnosed acute lower back pain-sacrolilitis, and administered Toradol. Plaintiff continued to see her primary care provider for headaches and chronic pain issues. The April 15, 2008 assessment was Fibromyalgia. (Tr. 717).

On April 21, 2008, the primary care physician noted that Plaintiff was feeling edgy and agitated with a lack of concentration. Plaintiff was stressed and having headache pain. Plaintiff was referred to Alpine Center for assessment and counseling. (Tr. 716) The June 2008 note shows that Plaintiff was on Cymbalta and was complaining that her mind would not shut off. (Tr. 714) Plaintiff continued to treat for Fibromyalgia pain, chronic headaches and a shoulder injury that occurred in May 2008.

In June 2009, Plaintiff was seen for right hip pain from a fall at the White County Memorial hospital emergency room. (Tr. 541-546) In August 2009, Plaintiff was complaining of persistent pain and sweats. There was a concern that her current medication of Lexapro was no longer working due to increased mental health symptoms of crying spells, lack of interest and social isolation. (Tr. 335)

On September 13, 2010, Plaintiff self-referred for an initial evaluation at the Wabash Valley Alliance. She was having difficulty with symptoms of depression and anxiety that were preventing her from taking classes at Ivy Tech Community College. The initial assessment was Mood Disorder NOS and Generalized Anxiety Disorder by the Intake Social Worker. Plaintiff was having racing

6

thoughts, manic episodes, auditory hallucinations and depression. (Tr. 432, 720-711). A note on September 14, 2010 indicated that Plaintiff was encouraged to speak to her primary care practitioner about vomiting issues. Plaintiff began working with the therapist about night terrors and fear of the dark. (Tr. 708)

On September 17, 2010 Plaintiff was seen at the St. Elizabeth Central Hospital in Lafayette Indiana with nausea, vomiting, depression and anxiety, reporting a 35 pound weight loss over the prior three months. (Tr. 393-395) On September 18, 2010, Plaintiff was admitted to the St. Elizabeth East Hospital with intense feelings of sadness, fear and suicidal thoughts. She was diagnosed upon admission by Dr. Michael Kaye with Major Depression, Severe with a global assessment of functioning (GAF) score of 20. (Tr. 413) Plaintiff was discharged stabilized on September 25, 2010. (Tr. 411)

Plaintiff was formally evaluated by treating psychiatrist Dr. Richard Rhadert for the first time on October 4, 2010. She was evaluated for her long history of mood swings and reactions to medications. Dr. Rhadert noted episodes of energy and incessant cleaning. Plaintiff's mind races whether happy or sad, and she reported a $19,000 shopping spree on credit cards. (Tr. 435-436) Dr. Rhadert noted Plaintiff's weight loss. His diagnosis was Bipolar Disorder I, Mixed, and Anorexia, with a GAF of 25. (Tr. 436, 1080) Medications were changed to Klonopin and Paxil. Plaintiff began regular therapy in accordance with the treatment plan and tried to learn to observe her mood swings.

Plaintiff was seen for a consultative evaluation requested by the Indiana Disability Determination Bureau on November 18, 2010. Dr. Victor Rini's summary indicated a diagnosis of Bipolar II, Depressed with a GAF of 60. (Tr. 421-423) Despite noting impulse spending of $20,000, Dr. Rini felt that the Plaintiff would have no trouble managing funds. The treatment notes from December 1, 2010 show Plaintiff was having trouble being drowsy, feeling numb, having crying

spells. She was also having hair loss due to the Depakote. (Tr. 437) The January 2011 note indicates that drowsiness was better but Plaintiff was having increasing irritability and break-through crying spells. (Tr. 700, 478) Medication changes were held up by insurance and medication assistance program denials. Plaintiff continued to complain of headaches and hair loss.

In March 2011, Plaintiff's symptoms of depression became even worse. She was having continuing headaches, hair loss and loss of appetite. She went off her medications and after two weeks was seen in the emergency room at St. Elizabeth East Lafayette in March 24, 2011. She was having increasing suicidal ideation. She was admitted for a week and discharged April 1, 2011 with a diagnosis of Bipolar Disorder, recurrent, severe. (Tr. 669) Dr. Rahdert saw Plaintiff on April 20, 2011 noting the Plaintiff had not been eating and was malnourished. Plaintiff was waiting for Medicaid to determine eligibility for Lithium. (Tr. 697)

A second psychologist evaluation was ordered by the Indiana Disability Determination Bureau as part of the reconsideration request. Dr. Betty Pate evaluated claimant and provided diagnosis of Bipolar Disorder, and Anxiety Disorder with a GAF score of 50. Dr. Pate believed that Plaintiff would require assistance with managing funds. (Tr. 516-523) Dr. Rahdert's August and October visit notes indicate more stability, that Lithium had started but Plaintiff was having issues with restlessness and reported that she was in motion all night and could not sleep. (Tr. 693-695) Problems with anxiety and panic were preventing Plaintiff from going shopping. In December 2011 Plaintiff reported to Dr. Rahdert that she was able to gain some weight back while on the medication Remron, but that it she was having trouble thrashing around in her sleep. She also was taking Lithium three times a day, and Klonopin. (Tr. 686)

In January 2012, Plaintiff was trying to cope with anger and anxiety episodes. (Tr. 685) In February and March 2012 the therapist worked with Plaintiff to accept some church and spiritual

8

teachings to help to deal with anger and mood swings. (Tr. 764-765) In May 2011, Plaintiff appeared ill and irritable. (Tr. 763) A May 16, 2012 note by Dr. Rahdert indicates that Plaintiff was having panic attacks and a feeling of "darkness and evil" encompassing her when she is stressed. (Tr. 762) Plaintiff reported she shuts down. Plaintiff further reported she has difficulty remembering things and has poorer cognitive skills when she is down and depressed. Dr. Rahdert made a medication change. (Tr. 762) The June 14, 2012 note with the therapist discusses the pain and a cortisone injection just received. The therapist believed Plaintiff's pain may be affecting her mood. (Tr. 758)

Dr. Rhadert prepared a narrative describing Plaintiff's diagnosis and course of treatment on July 2, 2012 and prepared a medical source statement of limitations. Dr. Rahdert noted that Plaintiff was then prescribed Lithium Carbonate, Paroxetine, Mirtazapine, Clonazepam and Omeprazole. He specifically noted that the list of medications causes Plaintiff to experience drowsiness, weight gain, thirst, dizziness, confusion, unsteadiness, loss of coordination, severe shaking in her hands, diarrhea, constipation, sweating, headaches and restlessness. (Tr. 767)

In the medical source statement, Dr Rahdert opined that Plaintiff had marked limitations in being able to maintain work attendance and be punctual, sustain an ordinary work routine, complete a workday, accept criticism, deal with normal workplace stress and extreme limitations in paying attention for a two hour segment of time, or being able to work at a consistent pace without an unreasonable number of rest breaks. (Tr. 770-771). Dr. Rhadert explained the marked limitations. He explained that Plaintiff had low stress tolerance and became overly anxious, felt criticized even when not and worried about failing. Plaintiff had trouble thinking logically and gave up easily. Dr. Rahdert noted very labile emotions, that the Plaintiff cries easily, gets angry and agitated easily, and feels

9

overwhelmed. (Tr. 772)

A narrative treatment summary was also presented by a neurologist, Dr. Ungar Sargon who explained that he had been seeing the Plaintiff since May 2012 upon referral of Dr. Gutierrez complaining of leg pain, radiating hip pain up her back to her neck. Dr. Ungar-Sargon noted loss of motion on the initial examination in the neck and right shoulder, with a positive Tinel's sign on the right. Straight leg rising as decreased on the right. There was loss of range of motion in the right hip. (Tr. 793) Dr. Ungar-Sargon explained that EMG testing confirmed the presence of carpal tunnel syndrome on the right as well as loss of axons in the right perineal nerve. He noted in his letter that Plaintiff used a carpal tunnel brace and the pain would come and go with use of the right hand. (Tr. 793) When Plaintiff had pain, she would have difficulty lifting and a worsening grip. Dr. Ungar-Sargon's letter also described the testing that showed acute and chronic lumbar L5-S1 radiculopathy and a CT scan that showed spondylosis. Dr. Ungar-Sargon did an injection on June 11 with no significant decrease in pain.

Dr. Ungar-Sargon opined that due to the physical impairments including thoracic pain that radiates in the buttock, and right leg, calf and ankle, Plaintiff had limitations on sitting about 30 minutes before having to get up and move about. (Tr. 794) He limited her walking to 10-15 minutes, walking for 2 blocks at most and shop with help. Dr. Ungar-Sargon had also reviewed the mental health examinations and records and opined that depression and anxiety would keep the Plaintiff from attending any class of work.

Dr. Rahdert prepared a post-hearing response, dated August 2, 2012, addressing concerns expressed by the ALJ at the July 26, 2012 hearing about current treatment and functional status. The doctor again outlined his position as the treating physician indicating that the Plaintiff had very little improvement over the two years he had seen her. He also explained the conceptual basis applied for

GAF scoring. (Tr. 806)

Additional medical evidence was presented to the Appeals Council as follows. On May 23 and 24, 2012, the Plaintiff underwent nerve conduction studies and EMG at the office of Dr. Juliam Ungar-Sargon, a neurologist and certified electrophysiologist. (Tr. 891- 909) EMG and nerve conduction studies indicated findings of acute denervation in the right lower extremity and provided a diagnosis of "Acute and Chronic Lumbar Radiculopathy L5-S1 right". (Tr. 898-899). The testing also supported the diagnosis of Carpal Tunnel Syndrome on the right. (Tr. 891-893) The test results included the "delay in right median latencies" (Tr. 893), and the diagnosis was right carpal tunnel. (Tr. 793) On June 11, 2012, Plaintiff saw the doctor again for an SI joint injection. (R. 880) She continued to see Dr. Ungar-Sargon and received SI joint injections for pain on July 2, 2012 and July 16, 2012. (Tr. 1018,1025) Some scheduled injections after that point in time were cancelled due to ongoing fevers. Records were provided of office visits for treatment through December, 2012. (Tr 967-1077). Dr. Ungar-Sargon offered another summary report dated January 6, 2013 addressing Fibromyalgia and disability. (Tr. 1078)

In support of remand, the Plaintiff first argues that the Appeals Council erred in failing to remand the claim upon receipt of new and material evidence that filled in the evidentiary gaps pointed out by the ALJ. Plaintiff's counsel submitted evidence consisting of test results and treatment notes and opinion from the treating neurologist, Dr. Ungar-Sargon, employment records, and further opinion of the treating psychiatrist. Plaintiff contends that these records should have indicated a remand was necessary as they supported treating physician opinions which were given either "no weight" or "little weight." In the unfavorable determination, the ALJ dismissed the narrative opinion and medical source statement of Dr. Ungar-Sargon dated July 25,

11

2012 that the Plaintiff was limited to walking and standing only 10 to 15 minutes at a time, and sitting only 30 minutes, and limitation on handling, fingering, and feeling with the right hand due to carpal tunnel syndrome on the basis that treatment records and that records of the test reports were not provided. (Tr. 793-801) The ALJ specifically stated he gave no weight to Dr. Sargon's opinion as the EMG and scan reports and medical notes were not within the record. (Tr. 25) These office visit notes were given to the Appeals Council.

The Notice from the Appeals Council indicated that the evidence was considered but did not provide a basis for changing the ALJ's unfavorable determination. (Tr. 1-2) Plaintiff contends that this language has been questioned by the 7th Circuit most recently in *Farrell v. Astrue*, 692 F3d. 767 (7th Cir. 2012). In *Farrell v. Astrue*, 692 F3d at 770, the court noted that the new evidence provided to the Appeals Council specifically filled an evidentiary gap and the Appeals Council's disregard of the evidence was legal error. *Id* at 772. Plaintiff argues that the Appeals Council should have ordered a remand on the basis of the new evidence.

In response, the Commissioner contends that *Farrell* is not dispositive because in the present case there is no ambiguity as to whether the Appeals Council found the evidence to be non-qualifying (not new, material, or time-relevant) or qualifying (new, materia, and time-relevant). The Commissioner notes that the Appeals Council determined that the ALJ's decision was not contrary to the weight of evidence of record. The Commissioner argues that the Appeals Council would have no reason to find that the ALJ's decision was not contrary to the weight of the evidence had it found the evidence was not new, material, or time-relevant. Rather, according to the Commissioner, the Appeals Council would have stopped its inquiry. The Commissioner further notes that in the present case the Appeals Council added the submitted additional evidence

12

to the record as several designated exhibits, thereby indicating that the Appeals Council found that it was new, material, and time-relevant.

However, as Plaintiff points out, the Commissioner's argument that the Appeals Council somehow must have determined that the evidence was new and material before moving on to review the case fails because the Notice of Appeals Council Action clearly states "We have denied your request for review." If a review had been granted, then a formal decision discussing whether the evidence was considered as new and material would have been written and new findings issued. Thus, it appears that the Appeals Council failed to properly evaluate the new evidence, or, if it did evaluate the new evidence, it failed to issue a decision discussing the evidence. For this reason, the court will now remand the entire case to the ALJ so that all of the evidence may be considered anew.

Plaintiff further contends that the ALJ failed to properly evaluate her Bipolar Disorder, and its impact on the functional ability to work. The ALJ assessed that Plaintiff could do a limited range of light work. Plaintiff contends there are errors in the ALJ's step three assessment of whether listing 12.04 was met or equaled and his evaluation of claimant's mental residual functional capacity in combination with pain. Plaintiff contends that the ALJ impermissibly played doctor and improperly interpreted medical evidence. Additionally, the Plaintiff argues that the ALJ improperly dismissed the opinions and findings of the treating psychiatrist, Dr. Rahdert. The Plaintiff contends that the ALJ "cherry picked" evidence from Plaintiff's good days to support his opinion that the listing was not met.

Clearly, an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that

13

points to a disability finding. *Denton v. Astrue*, 596 F3d 419, (7th Cir. 2010), see also *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009).

Dr. Rahdert was the Plaintiff's treating physician for two years. Dr. Rahdert wrote a narrative report and medical source statement on July 2, 2012 which appears in the record. (Tr. 767-773) An ALJ must consider all medical opinions in the record. See 20 C.F.R. § 404.1527(b), (c); *Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013), *Knight v. Chater*, 55 F.3d 309, 313–14 (7th Cir.1995). A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir.2004).

Even though the ALJ was not required to give Dr. Rahdert'a opinion controlling weight, he was required to provide a sound explanation for his decision to reject it. See 20 C.F.R. § 404.1527(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir.2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir.2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007). In the present case, the ALJ does not give much explanation at all for his rejection of Dr. Rahdert's extensive statements.

Dr. Rahdert's opinions bear heavily on the issue of meeting or equaling Listing 12.04 and residual functional capacity. Dr. Rahdert indicated Plaintiff has extreme issues with maintaining attention, attendance, and just being able to keep up with a normal routine. In his letters he addressed the issues of low stress tolerance and labile emotions. The medical records show that the Plaintiff's panic and anxiety and ups and downs prevented routine activities including shopping. Plaintiff contends that the record supports Dr. Rahdert's opinions and that the A criteria in Listing 12.04 is met.

In assessing the B criteria, the DDS medical consultant, Dr. Kladder, who had only seen a small amount of evidence prior to the second hospitalization in March 2011, found moderate

14

limitations in activities of daily living, social functioning and concentration persistence and pace in the January 2011 file review (Tr. 456) Without much explanation, the ALJ held that he disagreed and that Plaintiff had no limitation in activities of daily living. (Tr. 17) This is not supported by the record. The ALJ gives no explanation other than his personal and non-medical opinion that his assessment is more consistent with the evidence. The ALJ requested no medical expert to guide him in interpreting the all the evidence that came in after January 2011. Clearly the ALJ erred in failing to call a medical expert given the extensive record before him.

Further, the ALJ erred in finding no episodes of decompensation. This finding ignores the two psychiatric hospitalizations in September 2010 and March 2011 including the weeks surrounding them. The length of these decompensations and recovery should have been evaluated by an expert. For an ALJ to assume that a Bipolar patient is completely recovered due to a higher GAF score upon a hospital release is inappropriate and a material factual error. The issue of the length of the decompensations needed to be evaluated by a medical expert. *Browning v. Colvin*, – F.3d –, No. 13-3836, 2014 WL 4370648, at *3 (7th Cir. Sept. 4, 2014) ("He was playing doctor (mental retardation is a disorder of the brain and functionally therefore a field of medicine), which an [ALJ] is not permitted to do").

The opinions of Dr. Rahdert contradict the ALJ's findings on both Listing criteria and RFC. Dr. Rahdert's medical notes at Wabash Valley Alliance indicate that the Plaintiff had depression cycles so severe that a she became malnourished and lost excessive weight. The ALJ fails to note all the treatment notes discussing Plaintiff's agitation, irritability, excessive crying and inability to sleep. While an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting his ultimate conclusion while

15

ignoring the evidence that undermines it. *Moore v. Colvin*, 748 F 3d. 1118, (7th Cir. 2013); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir.2012). The ALJ must confront the evidence that does not support his conclusion and explain why that evidence was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir.2004). In ignoring important medical evidence that favored Plaintiff's position, the ALJ committed serious error that requires remand.

## Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED to the Commissioner for proceedings consistent with this Order.

Entered: February 24, 2015.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court